IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| ROLAND DEAN GRESS, | ) Case No. 05-72063-ABF |
| NANCY KATHEY GRESS, | ) |
| | ) |
| Debtors. | ) |

## ORDER GRANTING MOTION OF TRUSTEE TO DENY CONFIRMATION

The Chapter 13 Trustee filed a motion to deny confirmation of the Second Amended Plan proposed by Debtors Roland and Nancy Gress. The issue is whether the Debtors are proposing to pay into the Plan all of their "projected disposable income to be received in the applicable commitment period," as required by Section 1325(b) of the Bankruptcy Code.[1] This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L), over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, the motion to deny confirmation will be sustained.

Debtors filed their bankruptcy petition on December 13, 2005, so the case is governed by the Bankruptcy Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").[2] As was the situation prior to BAPCPA, upon objection by the trustee or an unsecured creditor, a plan may not be confirmed unless it either pays unsecured claims in full, or provides that all of the debtor's projected disposable income will be paid to the trustee during a specified period of time, now referred to as the "applicable

---

[1] 11 U.S.C. § 1325(b)(1).

[2] S. 256, Pub.L. 109-8, 119 Stat. 23 (2005), applicable to cases filed after October 17, 2005.

commitment period."[3]

Before the enactment of BAPCPA, disposable income for all debtors was calculated by deducting from income those expenses that were "reasonably necessary to be expended for the maintenance or support of the debtor." Under BAPCPA, this standard would, at first reading, now only be applicable to debtors whose income is less than the median income for the state in which the debtor resides.[4] Under BAPCPA, for debtors whose income is above the applicable median income, such as Mr. and Ms. Gress, § 1325(b)(3) now requires them to calculate their disposable income according to § 707(b)(2), a section now commonly known as the "means test."[5]

In addition, the old law required all debtors, regardless of income level, to pay all projected disposable income to the trustee for a minimum period of three years. Under BAPCPA, however, debtors with income above the median are now required to pay all projected disposable income for a period of five years.[6] Also under BAPCPA, the amount of projected disposable income, once calculated, must be used "to make payments *to unsecured creditors* under the plan."[7]

---

[3] 11 U.S.C. § 1325(b)(1).

[4] 11 U.S.C. § 1325(b)(2); *see also In re McGuire*, ___ B.R. ____, 2006 WL 1527146 at *2 (Bankr. W.D. Mo. June 1, 2006).

[5] 11 U.S.C. § 1325(b)(3).

[6] 11 U.S.C. § 1325(b).

[7] 11 U.S.C. § 1325(b)(1)(B) (emphasis added). I note that the Debtors and the Trustee disagree as to the meaning of this phrase. Debtors contend that the phrase "payments to unsecured creditors under the plan" means that the projected disposable income, once calculated, can be used under the plan to service debts owed to priority unsecured creditors. The Trustee argues that, since

To calculate an above-median debtor's disposable income under the means test, debtors are now required to file a Form B22C, which, consistent with the statute, requires them to list their "current monthly income," which is based on the average of the income received in the six-month period ending on the last day of the calendar month prior to the filing of the case.[8] The means test then calculates a debtor's allowable expenses in large part by reference to uniform standard expenses promulgated by the Internal Revenue Service for use in its debt collection efforts.[9]  Significantly for purposes of this case, debtors under the means test are also given a deduction for secured debt, in the average amount due on such debt in each of the sixty months after the case is filed.[10]  For purposes of Form B22C, because those expenses are based on the circumstances existing at the time the petition is filed, this deduction is allowed regardless of whether the debtor intends to retain such property.

At the time of filing, Ms. Gress had monthly gross income of $7958.34.[11] Her employment has apparently not changed since that time.[12]  Mr. Gress showed monthly income

---

priority debt, divided by 60, is shown as an expense on the Form B22C, the Debtors' position amounts to double-dipping. However, because I conclude, discussed below, that the Debtors' Plan cannot be confirmed on other grounds, I need not reach that issue.

[8] 11 U.S.C.§ 101(10A).

[9] 11 U.S.C. § 707(b)(2)(A)(ii). *See also In re Renicker*, ___ B.R. ____. 2006 WL 1331487 (Bankr. W.D. Mo. May 11, 2006).

[10] 11 U.S.C. § 707(b)(2)(A)(iii) ("[t]he debtor's average monthly payments on account of secured debts shall be calculated as the sum of . . . the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition").

[11] Form B22C, Doc. 15, filed December 29, 2005

[12] *See* Amended Schedule I, Doc. 35, filed January 23, 2006.

of $1800 as a self-employed carpenter at the time of the filing, plus an additional $900 income from three rental properties.[13]  In connection with the rental properties, the original filings also showed three mortgage payments totaling $2906.52.[14]  In addition, the Debtors deducted monthly payments on three vehicles in the total amount of $737.17,[15] onw of which is driven by their adult child.  After taking their deductions for allowable expenses, including all of the mortgage and vehicle payments, the Debtors showed monthly disposable income, for purposes of Form B22C, of a negative $384.33 at the time of filing.

Based on these means test calculations, the Debtors originally argued that they should be able to propose a plan offering to pay nothing to their unsecured creditors.  Of course, those calculations assumed that they had rental properties which were losing money, and which have now been abandoned.  They also presumed that debtors would, and should, be allowed to continue making payments on a car driven by their adult child.  The Debtors' bankruptcy schedules show unsecured debts of $26,051.52.  The original plan proposed a monthly payment of $1300 for sixty months, none of which would be paid to unsecured creditors. Rather, the bulk of such payments was to be used by the Trustee to pay a total of $877.50 per month on the three vehicles.[16]  The rest was to be used to pay attorney and trustee fees, a small

---

[13] Form B22C, Doc. 15.

[14] Form B22C ($718.52 + $1064.00 + $1124.00).

[15] *Id.* ($309.65 + $316.69 + $110.83). I note that, based on the schedules, it appears that each of the three vehicles was purchased within 910 days prior to the filing of the case, thereby meaning that debtors are prohibited from stripping such secured claims down to the value of the collateral. *See* 11 U.S.C. § 1325(a)(9)(*).

[16] Chapter 13 Plan, Doc. 16, filed December 29, 2005 (claiming an secured debt expense of $292.50 per month on each vehicle).

arrearage due on the Debtors' residential mortgage, and arrearages due on two of the three rental property mortgages. The regular mortgage payments on all of the real properties were to be made directly by the Debtors, and not through the Trustee.

On January 12, 2006, the Debtors filed an Amended Plan. That plan reduced the payment to $1085. The reason for the reduction was that the Debtors at that point, just one month into the case, conceded that keeping two of the three rental properties made no sense, apparently because they were losing money. Since a portion of the original plan payment was to be used to pay the arrearages on the mortgages on the two properties they were now surrendering, the Debtors simply reduced their plan payment.

On January 23, 2006, the Debtors filed amended Schedules I and J, which show available funds of $2182.17 with which to make their plan payments, assuming that car payments are made by the Trustee through the plan. Along with these amended schedules, the Debtors filed an amended Form B22C, showing a negative $5.69 in monthly disposable income.[17]

Thereafter, on April 6, 2006, the Debtors filed a Second Amended Plan, which increases the plan payment to $1175. At the same time, they filed another amended Form B22C, which they contend shows disposable income of $81.56 per month.[18] Based on that calculation,

---

[17] Doc. 35, filed January 23, 2006. This Form B22C shows no income for Mr. Gress, and no rental income. It is not clear whether Debtors belatedly realized that Mr. Gress' "current monthly income" was incorrectly stated at the outset, or were changing it based on a change of circumstances. If the latter, such a change would not appear to be consistent with the definition of "current monthly income" under 11 U.S.C. § 101(10A).

[18] Doc. 55, filed April 6, 2006. This amendment shows $679,75 in rental income, but still no earned income for Mr. Gress.

multiplied by 60, the Second Amended Plan proposes a "disposable income pot" of $4800 being made available to all unsecured creditors, including those whose claims have priority. It is this Second Amended Plan which is the subject of this Order.

In enacting the means test, Congress intended to take away discretion from the courts as to higher income debtors, who were seen as abusers of the system. Arguably, for that reason, a mechanical test such as that argued by the Debtors should be applied here. As can be seen, however, the use of the means test in this fashion allows debtors to propose plan payments based on a sort of parallel universe, which sometimes has little or nothing to do with their actual situation. For that reason, the courts in this district have previously found that Congress could not have intended a purely mechanical application of the means test to determine the amount above-median debtors are required to pay to unsecured creditors.[19] Instead, the Form B22C serves merely as a starting point in determining the amount of projected disposable income available to unsecured creditors. We have also found that the applicable commitment period for Chapter 13 plans is a "temporal," as opposed to a "monetary," requirement.[20]

Thus, unless a plan proposes to pay all claims in full, a debtor is obligated to pay all projected disposable income to the trustee for the applicable commitment period, which, in this case, is five years. As shown, based on the current record, the Debtors have $2182.17 available for plan payments. A plan which pays administrative expenses, car debt, mortgage

---

[19] *See, e.g., In re McGuire*, 2006 WL 1527146.

[20] *See In re Schanuth*, ___ B.F. ____, 2006 WL 1515851 (Bankr. W.D. Mo. May 25, 2006).

arrearages, and $4800 to unsecured creditors would be paid off in just thirty-three months, according to the Trustee, if such funds were paid to the Trustee.  And, with such a payment, 100% of scheduled unsecured creditors could be paid off in forty months.  For that reason, I find that the plan as proposed violates §§ 1325(b)(1) and (4)(B) because it does not provide either that all of the Debtors' projected disposable income to be received in the five years after the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan, or that 100% of unsecured claims will be paid.

Finally, I note that, it appears at this juncture that the Debtors' disposable income may be sufficient to pay their unsecured claims of $26,051.52 in full.  In the event that Schedules I and J do not accurately reflect the Debtors' current situation, and they choose to file a plan paying less than 100% of claims, the Debtors should be prepared to offer evidence as to their current situation.

ACCORDINGLY, The Chapter 13 Trustee's motion to deny confirmation is SUSTAINED.  Debtors should file an amended plan within 20 days of this Order, or the case will be dismissed.

IT IS SO ORDERED.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: 6/14/06